UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> (1) CLS GLOBAL FZC LLC, and <br> (2) ANDREY ZHORZHES, a/k/a "Andrey Z.", <br><br> Defendants | Criminal No.  24cr10293 <br><br> Violations: <br><br> Count One: <br> Conspiracy to Commit <br> Market Manipulation and Wire Fraud <br> (18 U.S.C. § 371) <br><br> Count Two: <br> Wire Fraud <br> (18 U.S.C. § 1343) <br><br> Forfeiture Allegation: <br> (18 U.S.C. § 981(a)(1)(C) and <br> 28 U.S.C. § 2461) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1. Defendant CLS GLOBAL FZC LLC ("CLS") was a company registered in the United Arab Emirates. CLS operated both inside and outside the United States. CLS had a public website ("http://www.cls.global/") on which it purported to offer "market making" services for cryptocurrencies, such as the active monitoring of cryptocurrency trading and price fluctuations, trading in cryptocurrencies to capitalize on price fluctuations, and related consulting services. CLS received customer payments using several cryptocurrency wallets, including wallet addresses ending in a8Ea3, o3R66, CnLcW, and NpvAe, respectively ("the CLS Wallets").

2. Defendant ANDREY ZHORZHES, a/k/a "Andrey Z." ("ZHORZHES"), lived in the United Arab Emirates and worked for CLS.

3. Co-conspirator 1 ("CC-1"), Co-conspirator 2 ("CC-2"), and Co-conspirator 3 ("CC-3") were individuals who worked for CLS.

4. The NexFundAI Token was a cryptocurrency token created at the direction of law enforcement. NexFundAI operated on the Ethereum blockchain and was a security.

## Background

5. Virtual currency is a digital asset or digital representation of value that can be electronically traded and exchanged online. Virtual currency is not backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset. Cryptocurrency is a subset of virtual currency that utilizes blockchain technology. Like many fiat currencies, many cryptocurrencies have a fluctuating, market-based value.

6. Ethereum is a well-known blockchain that can be used to create different cryptocurrencies, which are referred to in the cryptocurrency community as "tokens." Each Ethereum-based token has its own coding (or "smart contract") that governs how the token operates. Tokens built using the Ethereum blockchain are fungible, meaning they can be exchanged for other Ethereum-based tokens.

7. Cryptocurrency can be stored in a cryptocurrency "wallet" located, for example, in an electronic storage device, in a cloud-based server, or on a cryptocurrency exchange. Cryptocurrency transactions can be made between wallets.

8. Cryptocurrency "exchanges" are digital marketplaces where individuals can purchase or trade cryptocurrencies. During the relevant period, Uniswap, LBank, KuCoin, Bittrex, and Binance were cryptocurrency exchanges that were available to the public, including to individuals in the United States.

### Overview of the Conspiracy and Scheme to Defraud

9. Beginning in at least in or about 2024, CLS, ZHORZHES, CC-1, CC-2, CC-3, and others known and unknown to the Grand Jury conspired to manipulate the trading volume and price of one or more cryptocurrencies in order to profit through payments from cryptocurrency companies and from the sale of those cryptocurrencies at inflated prices.

### Objects and Purpose of the Conspiracy and Scheme to Defraud

10. The objects of the conspiracy and of the scheme to defraud were to commit market manipulation and wire fraud. The principal purpose of the conspiracy and of the scheme to defraud was for the conspirators to enrich themselves.

### Manner and Means of the Conspiracy and the Scheme to Defraud

11. Among the manner and means by which CLS, ZHORZHES, CC-1, CC-2, CC-3, and others known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

   a. Advertising purportedly legitimate services on CLS's public website while privately offering clients illegal services that included market manipulation;

   b. Engaging in manipulative trades to artificially increase the trading price and volume of cryptocurrencies for the purpose of inducing others to buy them;

   c. Using multiple cryptocurrency wallets to hide the source of the manipulative trades;

   d. Selling cryptocurrencies for a profit, including at artificially and unlawfully inflated prices;

3

e. Obtaining additional profits through payments from cryptocurrency companies into the CLS Wallets; and

f. Using multiple cryptocurrency wallets to conceal the source of CLS's profits.

<u>Overt Acts in Furtherance of the Conspiracy and Scheme to Defraud</u>

12. On or about various dates between in or about 2024 and in or about August 2024, CLS, ZHORZHES, CC-1, CC-2, and CC-3, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy and the scheme to defraud:

*Market Manipulation of the NexFundAI Token*

13. On or about June 24, 2024, ZHORZHES sent a message over Telegram (an encrypted, cloud-based messaging service) to a purported promoter of the NexFundAI Token who had been referred to ZHORZHES by a representative of LBank. ZHORZHES described CLS's business as follows: "Our objective is to stimulate organic demand and attract new users and investors for token purchases." ZHORZHES identified other cryptocurrencies that CLS had assisted; directed the NexFundAI promoter to CLS's website; and proposed a call to discuss CLS providing market making services for the NexFundAI Token.

14. Thereafter, ZHORZHES exchanged messages with several purported NexFundAI promoters in a private Telegram chatroom named "NEXF-CLS."

15. During a videoconference on or about July 3, 2024 with the purported NexFundAI promoters, ZHORZHES explained how CLS could generate trading volume on multiple cryptocurrency exchanges, such as Uniswap and LBank, stating:

a. "The thing that we can help with is volume creation. We can help with volume generation so you guys are able to meet exchange requirements, if you are applying for a tier 1 exchange."

b. "We have an algorithm that . . . basically does self-trades, buying and selling, and the only expenses you have are the gas fee and the exchange fee."

c. "We do that from multiple wallets so it's not visible . . . it looks like organic buying and selling that is happening . . . so it does not look like an algo[rithm] is trading, because if it is obvious, then it doesn't make much sense."

d. "The idea of volume generation is creating some volume on the decentralized exchange so the token looks organic and looks live and people get interested in trading it."

e. "We do that by transferring the funds into multiple wallets, that could be as many as you guys wish . . . from which we do the buying and selling . . . and generate some desired number for you. We decide some number we wish to generate per day . . . can be 100, 200, 300k, doesn't matter, and then we generate these number[s] . . . on a 24-hour timeframe."

f. "It's very hard to track. . . . We've been doing that for many clients."

g. "I know that it's wash trading and I know people might not be happy about it."

16. On or about July 4, 2024, ZHORZHES directed another CLS employee to email a draft "License Agreement" for CLS's market making services to the purported NexFundAI promoters. Under the terms of the draft agreement, CLS would provide "computer programs and databases . . . designed to allow Licensee to create, backtest and deploy trading strategies." The

draft agreement listed services that were not identified on CLS's public website, including the use of an algorithm that "gathers all data from the market, such as volumes, order flow, average order size and frequency to perform market trades allowing to grow the trading volume . . .."

17. During a video teleconference on or about August 1, 2024 with the purported NexFundAI promoters, ZHORZHES reiterated that CLS could use multiple wallets to generate trading volume for the NexFundAI Token "to create the FOMO [fear of missing out]."

18. On or about August 15, 2024, ZHORZHES sent a "Market Making proposal for NEXF" to the purported NexFundAI promoters. Under a section titled "Volume Support," the proposal stated: "Supported and organic trading data is easily trackable on the dashboard." The proposal included the following accompanying image of "the dashboard" showing "total volume," "CLS volume," and "external volume":



19. On or about August 19, 2024, ZHORZHES emailed the purported NexFundAI promoters an executed version of the "License Agreement" to provide market making services for the NexFundAI Token. An invoice provided with the License Agreement identified the CLS Wallets that CLS used to receive payments under the contract.

20. Between on or about August 20 and August 22, 2024, ZHORZHES, CC-1, CC-2, and the purported NexFundAI promoters exchanged messages over another private Telegram chat named "CLS <>NEXF" that included the following:

    a. On or about August 21, 2024, CC-1 stated, "Here is the cheapest way we can keep volume creation on" and outlined a plan to use 30 wallets to create "32k" in trading volume per day over a 31-day period.

    b. On or about August 22, 2024, CC-1 sent a list of 30 cryptocurrency wallet addresses that CLS would use to trade the NexFundAI Token (the "CLS Trading Wallets").

    c. On or about that same day, CC-2 stated, "we need about an hour to finalize the setup and distribute the funds across the deployed wallets. We'll have the volume generation started tomorrow!"

21. Beginning on or about August 23, 2024, traders from CLS bought and sold the NexFundAI Token on the Uniswap cryptocurrency exchange using the CLS Trading Wallets.

22. Between August 23 and September 4, 2024, ZHORZHES, CC-1, CC-2, and CC-3 sent additional messages over the "CLS <>NEXF" chat that included the following:

    a. On or about August 23, 2024, CC-3 stated, "We've successfully run the volume generation algorithm" and "daily target is $32K."

    b. On or about August 24, 2024, CC-3 stated, "We continue to generate volume. At the moment we have generated $28,735, so after the first 24 hours, the target value of $32K will be reached. We will provide a more detailed report after a week, when the statistics have had time to form."

7

    c. On or about August 27, 2024, CC-3 stated, "Volume generation is going well, we manage to maintain the $32K/24h level" and reported that CLS had executed 125 trades.

    d. On or about August 30, 2024, CC-2 shared the "NEXF volume report" that reflected CLS had made 201 NexFundAI trades that week and that the total weekly trading volume was $210,123. CC-2 also stated that only $7,738 of that trading volume was "organic volume."

    e. On or about September 4, 2024, CC-3 reported that, between August 31 and September 4, 2024, CLS had generated an additional $116,143.959 *in trading volume* through 120 trades.

23. During a video teleconference with the purported NexFundAI promoters on or about September 5, 2024, ZHORZHES confirmed that the "total generated volume" that CC-2 had reported was the "overall volume that is generated through the bot—self-trading, buying and selling. It's not organic; it's not like users coming and buying the token." ZHORZHES also confirmed that "organic volume" was "organic buying that happened."

24. During the same videoconference, ZHORZHES told the NexFundAI promoters about a cryptocurrency customer that CLS had "launched from the beginning" and "helped to get to Kucoin." ZHORZHES described another customer for which CLS executed a "trading strategy" that helped get the customer "from Bittrex [a smaller exchange] to Binance [a major exchange] in three months."

25. Continuing on and after September 5, 2024, traders from CLS continued to use the CLS Trading Wallets to buy and sell the NexFundAI Token on the Uniswap cryptocurrency

exchange, until the trading function of the NexFundAI Token was disabled at the direction of law enforcement.

<u>COUNT ONE</u>
Conspiracy to Commit Market Manipulation and to Commit Wire Fraud
(18 U.S.C. § 371)

The Grand Jury charges:

26. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25 of this Indictment.

27. Beginning in at least in or about 2024 and continuing through August 2024, in the District of Massachusetts and elsewhere, the defendants,

(1) CLS GLOBAL FZC LLC, and
(2) ANDREY ZHORZHES, a/k/a "Andrey Z.",

conspired with CC-1, CC-2, CC-3, and others known and unknown to the Grand Jury to:

a. commit market manipulation, that is, knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, directly and indirectly to effect a series of transactions in securities registered on a national securities exchange, and securities not so registered, to create actual and apparent active trading in such securities, and to raise and depress the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff(a); and

b. commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 371.

11

## COUNT TWO
## Wire Fraud
## (18 U.S.C. § 1343)

The Grand Jury further charges:

28. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25 of this Indictment.

29. In or about August 2024, in the District of Massachusetts and elsewhere, the defendants,

(1) CLS GLOBAL FZC LLC, and
(2) ANDREY ZHORZHES, a/k/a "Andrey Z.",

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit an August 20, 2024 Telegram message from ZHORZHES to a purported NexFundAI promoter located inside Massachusetts and others.

All in violation of Title 18, United State Code, Section 1343.

## FORFEITURE ALLEGATION
## (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

30. Upon conviction of one of more of the offenses in violation of Title 18, United States Code, Section 371, relating to conspiracy to commit wire fraud and market manipulation, and Title 18, United States Code, Section 1343, relating to wire fraud, as set forth in Counts One and Two, the defendants,

(1) CLS GLOBAL FZC LLC, and
(2) ANDREY ZHORZHES, a/k/a "Andrey Z.",

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

31. If any of the property described in Paragraph 30, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants –

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 30 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER J. MARKHAM
DAVID M. HOLCOMB
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: September 19, 2024
Returned into the District Court by the Grand Jurors and filed.

_____  9-19-24 3:15pm
DEPUTY CLERK