

U.S. Department of Justice

*Joshua S. Levy*
United States Attorney
District of Massachusetts

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 8, 2025

Lex Urban, Esq.
The Blanche Law Firm
99 Wall Street, Suite 4460
New York, New York 10005

    Re:    <u>United States v. CLS Global FZC LLC et al.</u>
            Criminal No. 24-10293

Dear Attorney Urban:

    The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, CLS Global FZC LLC ("CLS Global" or "Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure ("Rule") 11(c)(1)(C):

    1.    <u>Change of Plea</u>

    No later than February 20, 2025, Defendant will plead guilty to the two-count Indictment charging conspiracy to commit market manipulation and wire fraud in violation of 18 U.S.C. § 371 (Count One) and wire fraud in violation of 18 U.S.C. § 1343 (Count Two). Defendant admits that Defendant committed the crimes specified in these counts and is in fact guilty of each one. Defendant agrees to venue of the case in the District of Massachusetts. Defendant knowingly waives any applicable statute of limitations and any legal or procedural defects in the Indictment.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties:

    a) On Count One, conspiracy to commit market manipulation and wire fraud, a fine of $500,000 or twice the pecuniary gain or loss from the offense, whichever is greater; a term of probation of not more than five years; a mandatory special assessment of $400; restitution; and forfeiture.

1

    b) On Count Two, wire fraud, a fine of $500,000 or twice the pecuniary gain or loss from the offense, whichever is greater; a term of probation of not more than five years; a mandatory special assessment of $400; restitution; and forfeiture.

3.    <u>Rule 11(c)(1)(C) Plea</u>

In accordance with Rule 11(c)(1)(C), if the Court accepts this Plea Agreement, the Court must include the agreed disposition in the judgment. If the Court rejects any part of this Plea Agreement, the U.S. Attorney may void the agreement and/or Defendant may withdraw from it. Defendant may not withdraw Defendant's plea for any other reason.

Should the U.S. Attorney void the agreement and/or Defendant move to withdraw Defendant's guilty plea, Defendant agrees to waive any defenses based upon statute of limitations, the constitutional protection against pre-indictment delay, and the Speedy Trial Act for all charges that could have been brought as of the date of this Plea Agreement.

4.    <u>Sentencing Guidelines</u>

The parties agree that the United States Sentencing Guidelines ("USSG") are calculated as follows:

    a) Defendant's offense level is calculated under USSG § 8C2.3(a) by reference to USSG § 2B1.1:

        i. Defendant's base offense level is 7, because Defendant's conviction on Count 2 carries a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

        ii. Defendant's offense level is increased by 2, because a substantial part of a fraudulent scheme was committed from outside the United States and the offense otherwise involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(B), (C)); and

        iii. Defendant's offense level is increased by the gain that resulted from the offense, approximately $3,000, which does not result in an increase to the offense level (USSG § 2B1.1(b)(1)(A), App. n.(3)(B)).

    b) Defendant's culpability score is 6:

        i. Defendant's score starts with 5 points (USSG § 8C2.5(a));

        ii. Defendant's score is increased by 2 points, because Defendant had 50 or more employees and an individual within substantial authority personnel

2

participated in, condoned, or was willfully ignorant of the offense (USSG § 8C2.5(b)(4)); and

iii. Defendant's score is decreased by 1, because Defendant clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct (USSG § 8C2.5(g)).

c) The term of probation is at least one year but not more than five years (USSG § 8D1.2(a)(1)).

Defendant understands that the Court is not required to follow this calculation. Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility, and may be released from the parties' agreed-upon disposition in Paragraph 5 if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crimes to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

5. <u>Agreed Disposition</u>

The parties agree on the following sentence:

a) a fine of $428,059.63, except that the fine amount will be reduced by the amount recovered through forfeiture as set forth in Paragraph 7, if any, and the amount paid to the U.S. Securities & Exchange Commission in Case No. 24-cv-12590;

b) forfeiture as set forth in Paragraph 7;

c) 3 years of probation as set forth in Paragraph 8; and

d) mandatory special assessments of $800, which Defendant must pay to the Clerk of the Court by the date of sentencing.

Defendant agrees that all criminal monetary penalties, including special assessment, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

6. <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct

3

appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

    b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

The U.S. Attorney agrees not to appeal the imposition of the sentence agreed to by the parties in paragraph 5.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

7.    Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

4

a) All funds, including cryptocurrency, and anything else of value located in the account with User ID 42132227 (including sub-accounts with User IDs 864465559 and 938873655) on the Binance cryptocurrency exchange.

b) All funds, including cryptocurrency, and anything else of value located in the accounts with User IDs 201938192, 66415195, and 133956595 on the KuCoin cryptocurrency exchange.

Defendant admits that these assets are subject to forfeiture on the grounds that the assets constitute proceeds of the charged offenses or was purposefully commingled with proceeds of the charged offenses.

Defendant hereby waives and releases any claims to personal property seized by the United States during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

Defendant agrees to assist fully in the forfeiture of the foregoing assets. Defendant agrees to promptly take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. Defendant further agrees (a) not to assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding, and (b) to testify truthfully in any such proceeding.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

8.  Probation

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, order the following conditions of probation for a period of three years:

a) All conditions set forth in Exhibit A, which were also agreed upon by Defendant and the U.S. Securities & Exchange Commission in Case No. 24-cv-12590.

The parties agree that these conditions are applicable pursuant to USSG §§ 8D1.1(a)(6), (8) and consistent with USSG § 8B1.2.

9. Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

10. Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

11. Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

12. Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\*   \*   \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorneys Christopher J. Markham and David M. Holcomb.

Sincerely,

JOSHUA S. LEVY
United States Attorney

By: _____
SETH B. KOSTO
Chief
Securities, Financial & Cyber Fraud Unit

KRISS BASIL
Deputy Chief
Securities, Financial & Cyber Fraud Unit

_____
CHRISTOPHER J. MARKHAM
DAVID M. HOLCOMB
Assistant U.S. Attorneys

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I, Filipp Veselov, the Chief Executive Officer and duly authorized representative of CLS Global FZC LLC ("CLS Global"), hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Indictment and Agreed-Upon Statement of Facts and Relevant Considerations in Exhibit B; (2) that CLS Global has had an opportunity to discuss this Agreement fully and freely with its counsel; (3) that CLS Global fully and completely understands each and every one of the terms of this Agreement; (4) that CLS Global is fully satisfied with the advice and representation provided to it by its counsel; (5) that I am authorized on behalf of CLS Global to enter into this Agreement and to take all such actions as may be necessary to effectual this Agreement; (6) that CLS Global has signed this Agreement knowingly and voluntarily; and (7) no additional promises or representations have been made to CLS Global by any officials of the United States in connection with this matter.

CLS Global FZC LLC
Defendant
By: Filipp Veselov
Authorized Representative

Date: 13.01.2025

## ACKNOWLEDGEMENT BY COUNSEL

I, Lex Urban, an attorney representing CLS Global FZC LLC, hereby expressly acknowledge the following: (1) that I have reviewed and discussed this Agreement with my client; (2) that I have explained fully each one of the terms of the Agreement to my client; (3) that I have answered fully each and every question put to me by my client regarding the Agreement; and (4) that I believe my client fully and completely understands all of the Agreement's terms.

LEX URBAN, ESQ.
Attorney for CLS Global FZC LLC

Date: 1/19/2025

**Exhibit A**
(Agreed-Upon Conditions of Probation)

Pursuant to the plea agreement in *United States v. CLS Global FZC LLC et al.*, Case No. 24-cr-10293, and consistent with the Consent Judgement in *Securities & Exchange Commission v. CLS Global FZC LLC et al.*, Case No. 24-cv-12590, Defendant CLS GLOBAL FZC LLC ("CLS GLOBAL") and the United States Attorney for the District of Massachusetts (the "U.S. Attorney") agree to the following conditions of probation:

1. CLS GLOBAL shall not participate, directly or indirectly, in any issuance, purchase, offer, or sale of any cryptocurrency on any cryptocurrency trading platform that CLS GLOBAL knows, or with reasonable diligence should know, is available to investors located in the United States, regardless of whether such trading platform employs a centralized limit order book or an alternative method of matching buyers and sellers of cryptocurrencies. The foregoing condition also binds the following as set forth in the Consent Judgment: (a) CLS GLOBAL's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with CLS GLOBAL or with anyone described in (a).

2. As set forth in the Consent Judgment, CLS GLOBAL shall take such reasonable steps as necessary to ensure that each current client of CLS GLOBAL: (i) is not a natural person resident in the United States; (ii) is not a partnership, corporation, or other legal person operating in, incorporated, or otherwise organized under the laws of the United States; (iii) is not owned or controlled by any natural person resident in the United States; and (iv) is not owned or controlled by any partnership,

1

corporation, or other legal person operating in, incorporated, or otherwise organized under the laws of the United States.

3. Should CLS GLOBAL become aware at any time that a client does not meet one or more of the criteria identified in Paragraph 2, CLS GLOBAL shall cease providing all services to such client as soon as practicable but in any event within 30 days.

4. CLS GLOBAL shall implement policies and procedures reasonably designed to ensure that each new client meets the criteria identified in Paragraph 2, as set forth in the Consent Judgment. Such policies and procedures shall include, at minimum, obtaining written attestations from each new client that it meets the criteria identified in Paragraph 2.

5. CLS GLOBAL shall implement policies and procedures reasonably designed to ensure that CLS GLOBAL is in compliance with the condition set forth in Paragraph 1, as set forth in the Consent Judgment.

6. An officer or director of CLS GLOBAL shall provide written certifications to the Securities and Exchange Commission of CLS GLOBAL's compliance with the conditions set forth in Paragraphs 1 through 5, as set forth in the Consent Judgment.

7. In the event that CLS GLOBAL has not complied with the conditions set forth in Paragraphs 1 through 5, an officer or director of CLS GLOBAL shall notify the Securities and Exchange Commission in writing within 15 days of the date on which CLS GLOBAL learned of the instance of non-compliance.

**Exhibit B**
(Agreed-Upon Statement of Facts and Relevant Considerations)

Pursuant to the plea agreement in *United States v. CLS Global FZC LLC et al.*, Case No. 24-cr-10293, Defendant CLS GLOBAL FZC LLC ("CLS GLOBAL") and the United States Attorney for the District of Massachusetts (the "U.S. Attorney") agree to the following statement of facts set forth in paragraphs 1 through 24 below. The relevant time period for the statement of facts is beginning in or about June 24, 2024 and continuing through August 2024.

*Background on CLS GLOBAL*

1. CLS GLOBAL was a company registered in the United Arab Emirates.

2. CLS GLOBAL had a public website ("http://www.cls.global/") on which it advertised its services, including "market making" services, "ongoing support for volatility managements," "exchange listings for expanded reach," "treasury management," and "liquidity needs."

3. CLS GLOBAL's website also advertised its cryptocurrency exchange "partners" below:



1

4. CLS GLOBAL's website also advertised the names of some if its "clients," including the businesses below:



5. CLS GLOBAL received client payments using multiple cryptocurrency wallets, including wallet addresses ending in a8Ea3, o3R66, CnLcW, and NpvAe, respectively ("the CLS Wallets").

6. CLS GLOBAL's website also advertised the names and pictures of its employees. CLS GLOBAL had more than 50 employees, all of whom were located outside the United States. Those employees included, for example:

2

      a. ANDREY ZHORZHES ("ZHORZHES"), who lived in the United Arab Emirates and was CLS GLOBAL's Middle East and North Africa Lead and Senior Business Development Manager.

      b. Other individuals, including "Individual 1," "Individual 2," and "Individual 3."

*Background on NexFundAI*

7. NexFundAI was a purported cryptocurrency company created as part of an undercover operation by the Federal Bureau of Investigation ("FBI"). This operation has been referred to publicly as "Operation Token Mirrors."

8. NexFundAI had a cryptocurrency token with the following contract address: 0x16ca471ae755f8a2cd4ec315a4a7439dcfebe54c. The NexFundAI token operated on the Ethereum blockchain.

9. NexFundAI also had a website—available at https://nexfundai.com—that purported to provide information about NexFundAI. For example:



3

10. The NexFundAI website described the NexFundAI token as an investment contract and purported to provide information about the operation of the token and its accompanying investment fund. For example:



11. Additional information about the NexFundAI token (*e.g.*, its coding and trading history) were available on publicly available websites such as Etherscan and DEXTools. Links to those websites were also available through the NexFundAI website. Per the information on those websites, the NexFundAI token's coding included a stop trading function, giving the creators of the NexFundAI token the ability to disable trading at any time. The NexFundAI token traded publicly (under the ticker symbol "NexF") through the Uniswap cryptocurrency exchange during the following periods:

 a. Trading was enabled on May 29, 2024 and then disabled on May 31, 2024.

 b. Trading was re-enabled on August 22, 2024 and then once-again disabled on September 18, 2024.

*CLS GLOBAL and NexFundAI*

12.  On or about June 24, 2024, ZHORZHES sent a message over Telegram (an encrypted, cloud-based messaging service) to a purported promoter of the NexFundAI Token who had been referred to ZHORZHES by a representative of the LBank cryptocurrency exchange. ZHORZHES described CLS GLOBAL's business as follows: "Our objective is to stimulate organic demand and attract new users and investors for token purchases." ZHORZHES identified other cryptocurrencies that CLS GLOBAL had assisted; directed the NexFundAI promoter to CLS GLOBAL's website; and proposed a call to discuss CLS GLOBAL providing market making services for the NexFundAI Token.

13.  Thereafter, ZHORZHES exchanged messages with several purported NexFundAI promoters in a private Telegram chatroom named "NEXF-CLS."

14.  During a videoconference on or about July 3, 2024 with the purported NexFundAI promoters, ZHORZHES explained how CLS GLOBAL could generate trading volume on multiple cryptocurrency exchanges, such as Uniswap and LBank, stating:

   a.  "The thing that we can help with is volume creation. We can help with volume generation so you guys are able to meet exchange requirements, if you are applying for a tier 1 exchange."

   b.  "We have an algorithm that . . . basically does self-trades, buying and selling, and the only expenses you have are the gas fee and the exchange fee."

   c.  "We do that from multiple wallets so it's not visible . . . it looks like organic buying and selling that is happening . . . so it does not look like an algo[rithm] is trading, because if it is obvious, then it doesn't make much sense."

5

    d. "The idea of volume generation is creating some volume on the decentralized exchange so the token looks organic and looks live and people get interested in trading it."

    e. "We do that by transferring the funds into multiple wallets, that could be as many as you guys wish . . . from which we do the buying and selling . . . and generate some desired number for you. We decide some number we wish to generate per day . . . can be 100, 200, 300k, doesn't matter, and then we generate these number[s] . . . on a 24-hour timeframe."

    f. "It's very hard to track. . . .. We've been doing that for many clients."

    g. "I know that it's wash trading and I know people might not be happy about it."

15. On or about July 4, 2024, ZHORZHES directed another CLS GLOBAL employee to email a draft "License Agreement" for CLS GLOBAL's market making services to the purported NexFundAI promoters. Under the terms of the draft agreement, CLS GLOBAL would provide "computer programs and databases . . . designed to allow Licensee to create, backtest and deploy trading strategies." The draft agreement listed services that were not identified on CLS GLOBAL's public website, including the use of an algorithm that "gathers all data from the market, such as volumes, order flow, average order size and frequency to perform market trades allowing to grow the trading volume . . . ."

16. During a video teleconference on or about August 1, 2024, with the purported NexFundAI promoters, ZHORZHES reiterated that CLS GLOBAL could use multiple wallets to generate trading volume for the NexFundAI Token "to create the FOMO [fear of missing out]."

6

17. On or about August 15, 2024, ZHORZHES sent a "Market Making proposal for NEXF" to the purported NexFundAI promoters. Under a section titled "Volume Support," the proposal stated: "Supported and organic trading data is easily trackable on the dashboard." The proposal included the following accompanying image of "the dashboard" showing "total volume," "CLS volume," and "external volume":



18. On or about August 19, 2024, ZHORZHES emailed the purported NexFundAI promoters an executed version of the "License Agreement" to provide market making services for the NexFundAI Token. An invoice provided with the License Agreement identified the cryptocurrency wallets that CLS GLOBAL used to receive payments under the contract.

19. Between on or about August 20 and August 22, 2024, ZHORZHES, Individual 1, Individual 2, and the purported NexFundAI promoters exchanged messages over another private Telegram chat named "CLS <>NEXF" that included the following:

   a. On or about August 21, 2024, Individual 1 stated, "Here is the cheapest way we can keep volume creation on" and outlined a plan to use 30 wallets to create "32k" in trading volume per day over a 31-day period.

  b. On or about August 22, 2024, Individual 1 sent a list of 30 cryptocurrency wallet addresses that CLS would use to trade the NexFundAI Token (the "CLS Trading Wallets").

  c. On or about that same day, Individual 2 stated, "we need about an hour to finalize the setup and distribute the funds across the deployed wallets. We'll have the volume generation started tomorrow!"

20. Beginning on or about August 23, 2024, traders from CLS GLOBAL bought and sold the NexFundAI Token on the Uniswap cryptocurrency exchange using the CLS Trading Wallets.

21. Between August 23 and September 4, 2024, ZHORZHES, Individual 1, Individual 2, and Individual 3 sent additional messages over the "CLS < >NEXF" chat that included the following:

  a. On or about August 23, 2024, Individual 3 stated, "We've successfully run the volume generation algorithm" and "daily target is $32K."

  b. On or about August 24, 2024, Individual 3 stated, "We continue to generate volume. At the moment we have generated $28,735, so after the first 24 hours, the target value of $32K will be reached. We will provide a more detailed report after a week, when the statistics have had time to form."

  c. On or about August 27, 2024, Individual 3 stated, "Volume generation is going well, we manage to maintain the $32K/24h level" and reported that CLS had executed 125 trades.

8

  d. On or about August 30, 2024, Individual 2 shared the "NEXF volume report" that reflected CLS had made 201 NexFundAI trades that week and that the total weekly trading volume was $210,123. Individual 2 also stated that only $7,738 of that trading volume was "organic volume."

  e. On or about September 4, 2024, Individual 3 reported that, between August 31 and September 4, 2024, CLS had generated an additional $116,143.959 in trading volume through 120 trades.

22. During a video teleconference with the purported NexFundAI promoters on or about September 5, 2024, ZHORZHES confirmed that the "total generated volume" that Individual 2 had reported was the "overall volume that is generated through the bot—self-trading, buying and selling. It's not organic; it's not like users coming and buying the token." ZHORZHES also confirmed that "organic volume" was "organic buying that happened."

23. During the same videoconference, ZHORZHES told the NexFundAI promoters about a cryptocurrency customer that CLS GLOBAL had "launched from the beginning" and "helped to get to Kucoin." ZHORZHES described another customer for which CLS executed a "trading strategy" that helped get the customer "from Bittrex [a smaller exchange] to Binance [a major exchange] in three months."

24. Continuing on and after September 5, 2024, traders from CLS GLOBAL continued to use the CLS Trading Wallets to buy and sell the NexFundAI Token on the Uniswap cryptocurrency exchange, until the trading function of the NexFundAI Token was disabled at the direction of law enforcement.

*Relevant Considerations*

25. Upon learning of the charges in this case and the related enforcement action brought by the SEC, CLS GLOBAL promptly retained counsel to assist with accepting legal responsibility for the foregoing conduct, making voluntary disclosures to U.S. authorities, and augmenting compliance controls and company policy to address and mitigate U.S. legal risks. These efforts included, prior to the imposition of conditions by the U.S. authorities, an internal review of service offerings for compliance with U.S. law, revisions to licensing agreements, and modifications to CLS GLOBAL's website to prevent services from being offered to U.S.-based persons.

26. As a result of these efforts, and the undertakings by CLS GLOBAL in connection with the resolution of this matter and the parallel proceeding brought by the SEC, CLS GLOBAL has demonstrated recognition and affirmative acceptance of responsibility under USSG § 8C2.5(g)(3) and responded to the charges in this case in a manner that serves as a significant mitigating consideration in connection with this resolution and at sentencing.